## Case No. 15,299.

UNITED STATES v. HANWAY.

[2 Wall. Jr. 139: 9 Leg. Int. 22: 4 Am. Law J. (N. S.) 458: 9 West. Law J. 103.] [1]

Circuit Court, E. D. Pennsylvania. Oct. Term, 1851.

JURORS—CHALLENGE—TREASON—INDICTMENT—RESISTANCE TO LAW—FUGITIVE SLAVE LAW.

1. One who being summoned as a juror in a case, where treason was charged to have been committed—stated, on being challenged, that he had read the newspaper accounts of the facts at the time, and come to his own conclusions—had made up his mind, that the offence was treason, though he had not expressed that opinion,—nor apparently formed nor expressed an opinion that the defendant was or was not engaged in the offence—is incompetent to sit as a juror. (Walsh's case.)

2. One who has formed a conditional, but not an absolute opinion on the law of treason: who says he can't understand how treason can be committed against the United States if such and such facts do not constitute it, is competent to sit as a juror, if he says that, on being in-

[1] [Reported by John William Wallace, Jr., Esq. 9 West. Law J. 103, contains only a partial report.]

structed by the court, that the opinion is erroneous, such opinion will cease to influence him as a juror. (Reynolds' case.)

3. The prosecution have no right to ask a juror. whether he has so made up his mind [on facts?] as that it could not be altered in the course of a trial; there being no obligation on the prisoner to take upon him the burden of changing the juror's mind to the extent, that even if this question were answered negatively, he might have to do it, to procure an acquittal. (Whitman's case.)

4. One who, without forming or expressing any opinion as to the matter to be tried, had "formed an opinion that the laws had been outraged," is competent. (Brinton's case.)

5. One who had "certainly expressed an unfavourable opinion towards the course of these gentlemen,"—that is a party of persons with whom the prisoner agreed in opinion: the person summoned being sensible of no such bias as would affect his action as a juror; having neither formed or expressed any opinion as to the guilt or innocence of the prisoner, or of the other persons charged to have participated with him in the offence: not presuming to be a judge whether the offence was treason; knowing none of "these gentlemen" individually, and meaning to express nothing more than an opinion against the transaction, and that the persons engaged in it ought to be punished, is competent. (Lyons's case.)

6. One who had formed, though not expressed, "some opinion" relative to the matter to be tried—who had made up his mind as to the subject of treason, provided the facts were proved, but not as to the guilt of the prisoner, was recommended by the court to be withdrawn; the trial being one for "treason"; the definition of which word in application, though not abstractly, had not yet been perfectly settled by judicial decision; and the court considering that his answer indicated that he might have "made up his mind" on the law of treason: and made it up differently from what the court would decide.

[Cited in Higgins v. Minaghan, 78 Wis. 604, 47 N. W. 941.]

7. The court, in the early empanelling of jurors, where the numbers unchallenged are yet great—or in particular trials. or in particular circumstances,—as where public opinion has been abused by the party-press—or where there is reason to suppose that the opinion of the neighbourhood from which the jurors came, may be biased—will allow more searching and particular questions to be put to the persons summoned as jurors, than it would afterwards. where it appears that a jury. such as would be entirely desirable. cannot be had: or where the case has not excited public interest. It will seek in the first instance, and as far as practicable. to have a jury not only free from legal bias, but even from any even light impressions about the case at all.

8. On an indictment for treason. everything tending to show that there was an intention to make public resistance to a law of the United States. is entirely evidence in chief. and cannot be received in rebuttal.

[Cited in Lawson v. Miller. 44 Ala. 616.]

9. On an indictment for treason. the intent of the act. being essential, it is competent to show, that a long time (say within nine months) before the alleged treasonable occurrence. facts had occurred. and rumours were prevalent in the neighbourhood, which would explain certain particulars relied on. to show treasonable intent, and make them show a different intent.

10. A person who stands indicted of treason along with the defendant in another indictment not now trying, is a competent witness for him in an indictment now trying. and in which such person is not included.

11. To constitute the offence of treason against the United States, there must be a conspiracy to resist generally and publicly, by force,—and an actual resistance by force or by intimidation, of numbers—of a law of the United States.

12. A conspiracy to resist by force the execution of such law in particular instances only;—a conspiracy for a personal or private as distinguished from a public and national purpose, is not treason; however great the violence, or force or numbers of the conspirators may be.

13. In a prosecution in the circuit for treason, in the alleged commission of which a citizen of a state, without the circuit, had been assaulted and killed, the court approves of the presence of special counsel from that state; as well counsel coming here by order of the governor of the state. as counsel employed by the friends of the deceased.

Hanway was indicted for treason against the United States, the punishment for which is death. A number of other persons also stood indicted at this term for the same offence in which he was said to be engaged. The bill charged Hanway with intending to resist, in a treasonable way, the execution of an act of congress passed September 16, 1850 [9 Stat. 462], and commonly called the "Fugitive Slave Law." As already stated. this law, its expediency, its constitutionality, and every thing connected with it, had been the theme of violent party debate. And a resistance to it, with which Hanway and the other persons were charged to have been connected, had also been the subject of general knowledge, of all kinds of representations, and of violent comment and debate: and this particular trial, the counsel, the court, the pleadings, the evidence, the law. had all engaged the columns of the party press, especially in New England. The prisoner being arraigned and the jurors ready to be called, a discussion arose here as to the proper questions to be put. The court said that they considered it due to the panel. and due also to the purposes of justice, that as far as possible every juror that was sworn to pass between the United States and the prisoner, should be entirely without bias of any sort whatever. That the offence of which the prisoner was charged. consisted of the two elements of the act, and the intent of that act. And that a juror who had formed an opinion as to the prisoner's participation in a certain act, or as to the intent which would be deducible from that act, had already passed in his mind upon a part of the general proposition involved in a question of guilt or innocence. In that view of the subject, the court allowed the following questions; precedents, with certain variations in some, being adduced for all of them. They said, however, in subsequent parts of the case, that they did not mean to promulgate and settle all and each of these questions. as the exactly proper and the only ones. to be put in all instances and under all circumstances. They would enlarge or limit their extent in application by construction. There being many treason trials to come on. they thought it possible,

that in the progress of the cases, it might become necessary, in order to have a trial at all, to modify the questions. They took notice of the fact, that there had been an attempt, by portions of the press, to prejudice the public mind and to anticipate the decisions of the court and jury on the subject of these trials, and stated that to be the reason why questions more searching than usual, were allowed. If it should turn out in the result, that the jurors summoned from the community were preoccupied by newspaper reports, but were yet capable according to their best judgment, of rendering a true verdict according to the law and the evidence, it might become indispensable to reconsider and modify questions settled in an earlier and different state of the case.

The questions allowed were these: (1) Have you any conscientious scruples upon the subject of capital punishment, so that you would not, because you conscientiously could not, render a verdict of guilty, death being the punishment, though the evidence required such a verdict? (2) Have you formed or expressed any opinion relative to the matter now to be tried? (3) Are you sensible of any such prejudice or bias therein, as may affect your action as a juror? (4) Have you formed or expressed any opinion as to the guilt or innocence of the accused, or of the other persons alleged to have participated with him in the offence charged against him in the indictment? (5) Have you heard anything of this case which has induced you to make up your mind as to whether the offence charged in the indictment constitutes treason or not? (6) Have you formed an opinion that the law of the United States, known as the "Fugitive Slave Law" of 1850, is unconstitutional, so that you cannot for that reason, convict a person indicted for a forcible resistance thereto, if the facts alleged in the indictment are proved, and the court hold the statute to be constitutional?

Walsh, in reply to the 2d and 3d questions —whether he was sensible of any such prejudice or bias, as would affect his action as a juror; and whether he had formed any opinion as to the guilt or innocence of the accused, or of the other persons alleged to have participated with him in the offence charged? answered, that he had read the newspaper accounts at the time, and "came to his own conclusions." He was challenged by the prisoner for cause.

Counsel of the United States. The cause is insufficient. If every juror who has come to a conclusion in his own mind, upon statements made in the newspapers, is to be excluded, we shall be scarcely able to obtain an impartial panel. Almost every intelligent man has read an account of this proceeding, given by the newspapers, and has undoubtedly formed some conclusion in his own mind. The human mind is so constituted, that facts can scarcely be brought to bear upon it that it does not conclude either pro or con, in regard to it. It is not enough that he should have read an account, and come to a conclusion upon it in his own mind. He must have expressed that conclusion. There is a difference between the formation and expression of an opinion. If the juror has formed an opinion, without having expressed it, he is not committed as far as language is concerned. He is not so far committed in one case as in the other. That pride and prejudice, which we all possess, is enlisted in requiring that an opinion expressed should be maintained and proved true. In the Case of Callender, before Judge Chase, a similar question was proposed to Mr. Basset. [Case No. 14,709, note 2.] See Mr. Basset's own account (Chase, Tr. p. 200). The indictment charged the publication of a certain book, being a malicious libel. Mr. Basset "had never seen the book, though he had extracts in the newspapers, and he had formed and expressed an unequivocal opinion, that if the extracts were correctly taken, and Callender was the author or publisher of that book, the book was a seditious act; but he had never formed and expressed an opinion in respect to the indictment, for he had neither seen nor heard it." Id. 6; 2 Chase, Tr. p. 487. He was admitted; and though this was found fault with, and made one of the charges against Judge Chase, on his trial, he was acquitted of impropriety—there being no dispute about facts—by a majority of 24 to 10. The ruling was referred to, apparently with approbation, by Chief Justice Marshall (Burr, Tr. p. 370), who explains Mr. Basset's account by saying, that Mr. Basset had declared the book to be a libel, but had not expressed an opinion who was the author.

GRIER, Circuit Justice. Before the court can exclude Mr. Walsh for cause, we wish to know if he has formed a conclusive opinion, that the transaction for which this defendant is upon trial, or his participation in it, was treasonable against the United States government. If he has, then he has formed an opinion which affects a most important matter in this case, which is, the intention of the defendant; or if he has formed an opinion that this defendant is or is not one of the persons who was guilty upon that occasion, and expressed it, that is important. But, standing merely by itself, his reply might be made by every juror, and we might not get a panel for two years.

GRIER, Circuit Justice. Have you formed a conclusive opinion as to whether the persons engaged in this transaction are indictable for treason?

Juror. I think the offence treason.

GRIER, Circuit Justice. You have made up your mind, I understand you. Have you ever expressed the opinion?

Juror. I do not remember that I have expressed it.

GRIER, Circuit Justice. Did you, at that time, form the conclusion in your mind, that the offence was treason?

Juror. I did, sir.

GRIER, Circuit Justice. That is sufficient. Walsh set aside.

Reynolds, in reply to the 4th question, whether he had formed or expressed any opinion as to the guilt or innocence of the accused, or of the other persons alleged to have participated with him in the offence charged, answered: I cannot say that I have formed an absolute opinion about it; I may have conditionally. It is in my mind a matter of doubt. I say that if it is not a treason, I don't see how treason against the United States can be committed; for as to 'levying war'—in the ordinary sense of the word war —against the United States, things could not go to that extent. A large army would not be allowed to assemble. The opposition would be put down before it presented such an aspect. I have also expressed an opinion that the white persons, if there were any engaged in it, were more culpable than the absconding slaves, who were led on by them. Challenged by the prisoner for cause.

Counsel for the United States. There is no difficulty here. The juror is asked if he has formed an opinion as to whether this is treason or not; and his answer is. "I do not know whether it was or not." He has not made up his mind upon the subject. "But if this was not treason, I do not know what constitutes treason." The point is, has he so armed his mind, that he is not disposed to take the law from the court, as presented by it? Will he act upon his own judgment, in opposition to it? And the question should be put, "Have you so formed an opinion, that if the court instructs you to the contrary, you will still hold it?" The opinion may be so light as to be easily removed.

Counsel for the prisoner. The intention of the court is, to get men that stand untainted by rumours. Mr. Reynolds asserts in effect, that he has made up his mind that it is treason; for he says he has formed an opinion, that if there can practically be treason against the United States, this is it. He has formed an opinion, that it is treason, if treason can be committed without levying war in the ordinary sense of the word. If, therefore, the court instructs him that it can, a conviction follows as of course. All the facts are prejudged. He has also gone a step further, and shows a bias and prejudice against the prisoner. He says he has expressed an opinion, that the white men, if any were engaged in the affair, as this prisoner, a white man, is charged to have been, were more guilty than the blacks whom they instigated. Therefore, the question naturally arises, whether that very expression is not a bias or prejudice against the prisoner on trial. Upon the two opinions given, we are entitled to a challenge.

GRIER, Circuit Justice. The juror is not disqualified by having formed opinions upon the law. if they are not of such a character as to influence his action, in case the court shall instruct him that they are erroneous: But if his action as a juror would be affected by those opinions in any degree, notwithstanding such instructions; it is good cause of challenge.

Reynolds challenged peremptorily.

Whitman in reply to the first four questions, had no conscientious scruples upon the subject of capital punishment, nor had he formed or expressed any opinion relative to the matter to be tried, nor was he sensible of any bias, which would affect his action as a juror, nor had he formed or expressed any opinion as to the guilt of the accused, or of the other persons alleged to have participated with him in the offence charged; but on the fifth question being put, whether he had heard anything which induced him to make up his mind whether the offence charged in the indictment constitutes treason"—said: "I have formed some opinion about that. I take this case to be pretty nearly similar to Fries's, which happened in the town from which I come." He was challenged for cause.

Counsel of the United States. The cause is insufficient; it having been decided in this circuit, that a juror who sat in a case where the defendant was charged with an offence, could sit and decide in another case where the defendant was charged with the same offence. The party having already answered that he is not sensible of any prejudice, which would affect his action as a juror, showed that his present answer was to be taken with a qualification, which made his conclusion harmless.

Counsel for the prisoner. The juror thinks the case like that of a particular individual, who was accused, tried and convicted of treason. In deciding that, he has passed upon the question of intention, which is a question to be submitted to the jury. The next question might be, "What do you mean by treason?" which we might find hard to answer; but here the juror has given the case of a man accused, tried, and convicted, and pardoned for treason; there can be no difficulty about the intention.

GRIER, Circuit Justice. The witness has not given a direct answer, and you may ask an explanation of it.

Counsel of the United States. Have you so made up your mind as to the character of the crime, that it could not be altered in the course of the trial?

GRIER, Circuit Justice. That is not a proper question. The prisoner must not have the burden of changing the juror's mind. This 5th question would not be a good one. except on the ground that in a public transaction of this character—the intention of each and all of the parties concerned, is one of the matters which go to make up treason. If the juror had fully made up his mind that this was not treason, it would be an opinion upon a portion

of the case, to wit, the intention of the parties concerned, which would make him unfit to be a juror in the case. It being eminently desirable that if it be possible, jurors in all these cases should be without any bias on one side or the other, we think—not meaning by this to lay down an absolute rule for the future, that perhaps the counsel of the United States had better allow Mr. Whitman to go.

Whitman set aside for the present.

Brinton had no conscientious scruples; but in reply to the question, whether he had formed or expressed any opinion relative to the matter now to be tried—answered that he had formed an opinion, "that the laws were outraged in this Christiana case." Challenged for cause.

GRIER, Circuit Justice. That is no reason for excluding the juror; I suppose every man in the community has formed the same opinion.

Brinton challenged peremptorily.

Lyons, in reply to the question, whether he had formed or expressed any opinion relative to the matter to be tried, had "certainly expressed an unfavourable opinion towards the course of these gentlemen:" but in reply to the other questions was sensible of no such prejudice or bias in the matter as would affect his action as a juror; had neither formed nor expressed any opinion as to the guilt or innocence of the accused, or of the other persons alleged to have participated with him in the offence charged against him in the indictment: and did not "presume to be a judge," whether or not the offence charged in the indictment was treason. He knew none of "these gentlemen" individually; had seen the names of some of them published, and likely had seen the prisoner's name among them, but did not know him.

GRIER, Circuit Justice. Did you mean to express anything more than an opinion against the transaction, and that the persons engaged in it ought to be punished?

Juror. No, sir.

GRIER, Circuit Justice. We do not consider that, taken with his answer to the other questions, is sufficient to exclude him. If a man has been informed that a burglary or arson has been committed, and has said the fellow who did that ought to be sent to the penitentiary—would that make him incapable of being a juror? If the juror had expressed an unfavourable opinion as to this defendant, it would be different; but his opinion having been only a general opinion as to this transaction, does not incapacitate him.

Challenged peremptorily.

Smith had formed "some opinion" relative to the matter to be tried; but had not expressed it. He had "made up his mind as to the subject of treason, provided the facts were proved, but not as to the guilt of the prisoner."

Challenged by the prisoner for cause.

Counsel for the prisoner. The witness has made up his mind about the law of treason. He assumes the office of the court: and whether his law is right or wrong, if certain facts which come up to his notion of what makes treason, he will find the prisoner guilty. In the case of Walsh, who was set aside, the juror's expression was, that he had "made up his mind." The court will not ask a juror, whether his mind being "made up," it will be altered by a charge from the court. That is a matter of mere speculation, and which no man can safely undertake to answer. All presumption is, that it will not be.

In Burr's Case [Case No. 14,693 (Proceedings of Monday, August 10, 1807)] Roberts was set aside, because "he had thought and declared from the reports in the public newspapers, that the prisoner was guilty of treason, though he had no doubt that his opinion might be changed by the production of other testimony." If this man goes into the jury box, we have to labour to get an impression out of his mind. He is not ab omni exceptione major. "A juryman," says Marshall, Chief Justice, "should come to a trial of a man for life, with a perfect freedom from previous impressions."

Counsel of the United States. The court has already said, in the case of Reynolds that a person is not disqualified from sitting, though he has formed an opinion of the law, if, when instructed that the opinion is wrong, it will not influence his action as a juror. This man has formed an opinion, if the facts stated in the papers are true, that those facts constitute treason, but he has not connected the prisoner in any way with the facts. That distinguishes the case from Roberts's, cited from Burr's trial. The juror here has formed no opinion conditional or otherwise as to the guilt or innocence of the prisoner, nor any opinion as to the truth of the facts stated in the newspapers. His opinion is abstract merely. Certain facts he believes constitute treason. So does every man of sense. But a man's intelligence is not to be cause for challenge.

GRIER, Circuit Justice. I think that if this were an ordinary case, as an indictment for burglary, the conclusions of the juror would hardly be sufficient to exclude him. It is very natural if your neighbour's house has been broken open and robbed at night, that you should come to the conclusion that a burglary had been committed; and such belief ought not to prevent a person being sworn in a panel, to try a man accused of the offence. There is no dispute there as to what is a burglary in the meaning of the law. I do, however, see some difference in this case. The whole country has been agitated by questions as to what in application legal is "treason." The defence will perhaps contend, that admitting every fact asserted, there is no treason. Its applied definition of

treason may be wholly different from that of the prosecution, while both of course adopt in the abstract the definition in the constitution. It is to the honour of our country, that the crime has never been so defined by judicial application of it to cases, as to settle its meaning in the same way as the meaning of other offences; burglary, for example, is settled. Now this witness would rather seem to have made up his mind upon the subject. He has settled for himself the meaning, in application, of the constitutional definition. This being a point, which will probably form a great subject of argument, and the matter not being absolutely res judicata, we think it best that this person should withdraw.

Challenge sustained.

### The principal case.

A jury being impanelled, the facts of the prosecutor's case as they appeared from its own evidence, were essentially these. On the 9th of September, 1851, Mr. Gorsuch, of Maryland, having procured from a commissioner of the United States. authorized to issue them, certain warrants to arrest some fugitive slaves of his, went with Kline, an officer, appointed by the commissioner, to Christiana, in Lancaster county, Pennsylvania, to take them. The place was inhabited by people who, in general, were strongly opposed to the fugitive slave law; many of them being violent and fanatical on this subject. Mr. Gorsuch's son. nephew and some relatives, went with the officer. The fact that the writs had issued, became known to Williams, a negro in Philadelphia, who preceded Kline and his party to the neighbourhood of Parker's house, where the slaves were lurking, and gave notice that the arrests were to be made. leaving with another person the names of some of Mr. Gorsuch's slaves. on a piece of paper. On the 11th, the officer and the others went over to Parker's. which they reached about daylight. While proceeding along the road. their attention was arrested by the sound of horns and the blowing of a bugle. After watching about Parker's house for a short time. one or two negroes were seen coming out of it. On discovering Kline and his party, they fled back into the house, and on pursuit being made by him. ran up stairs. These negroes were recognized by Mr. Gorsuch as his slaves. Kline entered the house. and almost immediately ascertained that a large number of negroes were concealed in the upper part of it; he nevertheless went to the stairway and called the keeper of the house to come down. stating that he was desirous of speaking to him. The negroes at this time were heard loading their guns. Kline, hearing the noise. said to them that there was no occasion for arming themselves,—that he designed to hurt no one, but meant to arrest two men who were in the house. and for whom he had warrants. Some one replied they would not

come down. Mr. Gorsuch then went to the stairway, called his slaves by name, and stated that if they would come down and return home, he would treat them kindly, and forgive the past. Kline then read the warrants three times, and afterwards attempted to go up stairs, when a sharp-pointed instrument was thrust at him, and an axe afterwards thrown down, which struck two of the party below. Mr. Gorsuch then went to the front door of the house, and looking up to the window, again called to his slaves by name, when a shot was fired at him from the window. To show that his party was armed, Kline fired his pistol. At this period a horn was blown in the house, which was answered by other horns from the outside, as if by preconcerted action. The negroes then asked fifteen minutes time for consideration, which was granted to them. At this moment a white man was seen approaching the house on horseback. It turned out to be Hanway. Kline walked towards him. and inquired if he resided in the neighbourhood. According to the testimony of this Kline, who was not a person of the best character for veracity, his answer was short and rude—"It is none of your business." Kline replied, by letting him know he was a deputy marshal of the United States. gave him the warrants to read, and called upon him, in the name of the United States, to assist in making the arrests. Hanway replied "he would not assist—that he did not care for that act of congress or any other act.—that the negroes had rights and could defend themselves, and that he need not come there to make arrests; for he could not do it." By this time another white man had arrived on the ground (Lewis), who walked up to Kline, and asked him for his authority to be there. Kline showed his papers to him also. Lewis then read the warrants, passed them to Hanway, who returned them to the marshal. Lewis, after reading the warrants. said, "the negroes had a right to defend themselves." Kline then called upon him to assist him in making the arrests, when he refused. and would not even tell his name. Kline then asked Hanway where his residence was? He replied, "You must find that out the best way you can." Kline then explained to them what his views of the act of congress of September 18, 1850, were, and informed them that through their agency these slaves would escape. By this time the blacks had gathered in very large numbers around the house, armed with guns, which they commenced pointing towards the marshal. At this juncture, Kline implored Hanway and Lewis to keep the negroes from firing, and he would withdraw his men. leave the ground, and let the negroes go. Hanway instantly replied, "they had a right to defend themselves, and he would not interfere." Kline's answer was, "they were not good citizens, or they never would permit the laws to be set at defiance in this way." One of Mr. Gorsuch's

family then remarked, "that all they wanted was their property, and that they did not wish to hurt a hair of any one's head." Lewis replied, "that negroes were not property;" and then walked away. By this time another gang of negroes had arrived, armed with guns and clubs, and Hanway rode up to them and said something which was not heard. He moved his horse out of the way of the guns; the negroes shouted, and immediately fired from every direction. Hanway rode a short distance down the lane leading from Parker's house, and sat on his horse watching the blacks. Kline then called to Lewis, telling him a man was shot, and begging him to come and assist, which Lewis refused to do. The number of negroes assembled at this time was between fifty and a hundred. Before the firing commenced, Mr. Gorsuch was struck with a club on the back part of the head, and fell forward on his hands and knees. As he was struggling to rise, and in the act of getting upon his feet, he was shot down amid frantic yells and howlings; and when prostrate on the ground, was cut on the head with a corn cutter, and beaten with clubs. His son on perceiving the attack made upon his father, immediately rushed to his assistance, when his revolver was knocked out of his hand, and he himself shot in various parts of the body, rendering him utterly helpless. A nephew was attacked at the same time, and defended himself with his revolver, which he twice snapped at his assailants, but the powder being wet it would not go off. He was also struck down, beaten and maltreated. When the firing commenced, Kline, in order to avoid its effects, escaped into a corn-field, but on seeing Mr. Gorsuch's son struggling, apparently wounded and bleeding, went to his assistance, and placed him under the shelter of a tree until aid could be procured. Two of the others of Kline's party were at the time making their escape. The negroes overtook one of them, knocked him down with a gun, beat and bruised him. The other escaped into a farm house, where he was concealed. A number of shots were fired at others, as they moved off. One was shot in the wrist, side and shoulder, and a ball also passed through his hat just above his forehead. In the effort to escape, these last rushed towards Hanway, who was on his horse which was yet standing still. They besought him to prevent the negroes from pursuing farther. He said he could not. They then asked for permission to get upon his horse, which would afford the means of making their escape. He refused their request, and putting whip to his horse rode off at full speed. Several of the United States party were subsequently carried to houses in the vicinity, and were a long time recovering from their wounds. Mr. Gorsuch was killed. In connexion with these facts it appeared from Kline's testimony (1) that so soon as Hanway appeared at the bars, the negroes

in Parker's house appeared to be encouraged, and gave a shout of satisfaction, when before that they had appeared discouraged, and had asked for time; (2) that before the firing commenced, Kline had given orders to his party to retreat, and they were actually engaged in the retreat when the attack was made; (3) that Mr. Gorsuch, who was killed, had no weapon of any kind in his hands.

Such was the case of the United States giving credit to all its testimony. No essential fact in it was disproved or indeed denied. The defence showed, however, that Hanway was a native of one slave state, had resided long in another, had been a resident of a part of the country far distant from Pennsylvania, and had been living in the neighbourhood of Christiana for only three years past, and while there was evidence that anti-slavery conventions had been held at West Chester, a place near Hanway's residence, where the fugitive slave law was denounced as unconstitutional, wicked and of no force against "the higher law of every man's own conscience," and denunciations made against every judge, who would enforce it, as governed by the spirit of Jeffries and Scroggs; there was no evidence that Hanway attended these meetings. As to the events of the morning of the 11th of September, the defence showed that about sunrise of that day, Lewis, already mentioned, was informed by a person, who was called at his house, that there were "kidnappers at Parker's house." And starting at once for this place, as he passed, gave the information to Hanway, who was just getting up. Hanway, in his shirt sleeves, mounted his horse, rode over, and at the place met Lewis, who had taken a nearer route across the fields. As they arrived Kline met them, and stating that he was marshal, required their aid. Lewis asked to see his authority, and Kline produced the writs. Meanwhile the blacks were rapidly gathering, and Hanway, pointing out the fact, warned the marshal of the danger of attempting, under such circumstances, an arrest, and advised him to retire. At the same time, and before any firing, they retired. And passing out of the road, Lewis followed by Kline, turned in one way, while Hanway rode off in another. In regard to this matter of "kidnappers," it was not easy to gather the exact facts of the case. It was certain that in September, 1850, and in March, 1851, men of bad character not having, or at least not professing to have any warrant of law, had in a rough way come to Christiana, and carried away at night, out of the houses where they were, two negroes, then residing there, who never again returned. But whether these negroes were runaway slaves, now taken home by men, who expected to be paid by the owners, or to get a reward publicly offered; or whether they were free persons of colour, stolen by "kidnappers" in the legal sense of the word, was not prov-

ed. The term was perhaps a slang one; it being one which had been frequently applied with others, as bad, to persons who came from the South, to recover their runaway slaves. It appeared, however, that the events excited some alarm in the place, which had many persons in it opposed to the fugitive slave law, and that there was some feeling of insecurity professed among the people of that neighbourhood.

### Points of evidence.

Such was the case as presented by the evidence given before the jury. A good deal of it was received after objection only, and hence upon this, as also upon evidence excluded there arose in the case several incidental points. For example, that relating to "kidnappers." In introducing this evidence, the counsel of the defence did it by asking a witness to state any fact he knew with regard to the kidnapping and carrying away coloured people in the neighbourhood of Parker's house, within a period of about nine months prior to the events of the 11th of September: but the object of the testimony being stated to be to show that there was great alarm in the region, about kidnappers and that Hanway came to see if these men were kidnappers or not.

Counsel of the United States. This testimony is irrelevant to the issue, and if it were introduced, would have a pernicious effect upon the execution of all law. We have charged that the defendant sought to resist the laws of the United States, and so far as the testimony is before this court, have shown that warrants were issued on the 9th; that notice in opposition to them was given immediately by Williams; that resistance took place on the 11th; that Hanway was on the spot, as by preconcert, saw the United States process in the hands of its officer and countenanced and encouraged the acts which took place. They purpose to show that nine months anterior to this 11th of September, there were parties who actually kidnapped. Can it be given in evidence that certain parties did nine months before commit an unlawful act? There is no crime in the world that could not be justified in the same way, and by showing that somebody had done a wrong anterior to it. If they can go back nine months, they can go back eighteen months. If they can show something within even two weeks, it will be admitted by us; but, to permit them to show that some other parties, not purporting to have any connection with this affair at all, committed a certain outrage nine months anterior to the time this transaction took place, is opening too wide a door on their side.

Counsel for the prisoner. The crime of treason consists in acts done, and the intention with which they were done. Many acts may be done which, if done with an intention to levy war against the United States, would be treason; but these same acts done without any such previous intention, would amount to an ordinary breach of the peace, or to misdemeanor and murder. The question for the jury is, what brought together these people, some armed and some unarmed. For if they have come together with a lawful intent, and afterwards, even they who came with such intent, committed murder, it is not treason. How then are you to show what brought these people together? The prosecution have given some slight testimony, such as the sounding of a horn about breakfast time, from which they will ask the jury to infer that there was a previous combination to resist the United States government. Now, what we propose to show is this: That there were residing in that immediate neighbourhood a gang of professional kidnappers: that they had not only upon one, but on two or three occasions, in the dead of the night, invaded the houses of the neighbours, (of white people, where black men lived, and black people,) and by force and violence and great injury and malice, without authority whatsoever, seized and carried these men away; and that they have never afterwards been seen or known of in those parts. And that in consequence of this, there was a general feeling of indignation, not against lawful authority, but against outlaws who thus prowled over and disturbed this neighbourhood. And that when the prisoner in the morning (for the first time) came out of his own house, not having heard any thing of this, he was informed that there were kidnappers trying to kidnap Parker, whom it was supposed was the object of the attack. And that in pursuance of such information, and with a full knowledge of the repeated acts of outrage and kidnapping in that neighbourhood, he went to the place where he did go. We do this to show what might have brought him there, which is one essential part of the case. And we do it, that if any body should suspect that "kidnapper" was a covert term or slang phrase, and that kidnappers did not mean kidnappers, to show that it did mean those who followed that business for a living.

GRIER, Circuit Justice. The objection of the prosecution would be irresistible if Hanway was indicted simply for resisting an officer of government. But in treason there must be some previous agreement. The prosecution will probably infer from certain premises a certain intent. They have given evidence that a negro went down on the 9th or 10th and said that kidnappers were abroad, or left certain hieroglyphics, or what you please; and applying this as a slang term to a master seeking his slaves, may argue conspiracy in a whole neighbourhood. But Hanway might not have understood it so; and though masters were there with proper process to arrest a runaway, I think

it will be proper for the defendant to show, that kidnappers, in a proper sense of the word, had been about, and that there was a degree of insecurity among the free ne-groes who resided in that neighbourhood. Suppose the sheriff came to my door, and I fired at him out of my window and killed him; under such circumstances you might infer I did it with the intention to murder an officer of the law. But suppose I could show, that a few nights, or even months, ago, a person had broken into my house, and committed a robbery, would you not infer from the fact, that my mind was bent upon something else, and far from any intention to murder the sheriff? Or take the analo-gous case of a person accused of murder, and upon the question of an intent, it is in proof, that he went to the place where the alleged murder was committed, bearing deadly weapons, it would certainly be per-mitted him to show that there was a gen-eral sentiment of personal insecurity in the community, which justified him in carrying arms, and that that was the reason why he had arms. The question is not perhaps in the strictest form You might ask more correctly, perhaps, if such rumours or fears were not prevalent. But this, in essence, is not important, and the inquiry may just as well be made as to the facts on which the belief was founded.

Question allowed.

### Second point of evidence.

In support of the defence, the prisoner's counsel called Lewis, the person who had informed Hanway of there being kidnappers at Parker's house. Lewis was not included in the present indictment with Hanway, but was included in another indictment which had been found, and in which Han-way, Lewis and one Scarlet were indicted together for treason; and in another also in which these same, with several negroes were indicted in the same way. The objection now made to Lewis's testimony was that he was interested in this indictment as an instrument of evidence; that if Hanway were acquitted on this indictment he could not be tried again, and that this acquittal would enure to Lewis's benefit on the other indictments in which he stood charged joint-ly with Hanway. There had been no ver-dicts. A party was brought into court to testify for a defendant who is indicted with him. If he can do this for Lewis, he can for others. Suppose indictments in which Lewis is not included against all of the other parties. Is Lewis a competent wit-ness to give testimony ad seriatim and thus to acquit all the others and so finally him-self; for if every one else is acquitted he cannot be guilty. Treason cannot be com-mitted, we assume, by a single person.

GRIER, Circuit Justice. No good prece-dent could be found, I think, where by send-ing up a bill of indictment against him, a

witness, otherwise competent, had been cut out entirely from giving evidence. If thir-ty or forty are indicted I see no reason why one may not be found guilty and the others acquitted. Or why if one has been tried and acquitted, the verdict in his favour would affect the others.

KANE, District Judge. Supposing there were many indicted for treason, and on their trial together, and no evidence given against one of the defendants, could not the court direct a verdict of acquittal, in order to make him an evidence for the defence? which presupposes there is no disqualifica-tion of evidence. Even in the common law there is a distinction between conspiracy and treason. The difference was this: that conspiracy was an offence essentially joint, and there must be a joinder in the indict-ment, and a conviction of more than one to make it. Treason may be committed sev-erally as well as jointly, and one may be indicted.

Witness allowed.

### Third point of evidence.

The defendant having closed his case as already reported, the United States offered testimony to prove that in September, 1850, to wit, a year before this outrage, the county of Lancaster, and particularly the neigh-bourhood of Christiana, was patrolled by armed bodies of negroes, who went from house to house in that neighbourhood, search-ing for certain owners of slaves who, it was reported, were thereabouts, attempting to recover their runaway slaves; the said bodies of negroes swearing vengeance and death against such slave owners. The pur-pose of such testimony was stated to be, to prove that for a long time there had been a regular organization, for the purpose of resisting in that neighbourhood upon every and all occasions, laws of the United States. No notice of the names or residence of the witnesses, by whom this was to be proved, had been given to the prisoner. The act of congress (Act April 30, 1790, § 29 [1 Stat. 118]) on the subject of treason, says, "that any person who shall be accused and in-dicted of treason, shall have a copy of the indictments, and a list of the jury and wit-nesses to be produced on the trial, for prov-ing the said indictment, mentioning the names and places of abode of such witnesses and jurors delivered unto him at least three entire days before he shall be tried for the same."

This testimony offered as above stated, was objected to by the counsel for the pris-oner, who contended that in the nature of an indictment for treason, it was testimony in chief and not rebutting testimony. Pre-vious combination is of the essence of trea-son. The prosecution has given evidence of such combination; (of what value, indeed, we will consider hereafter.) Now our case shows that we have not sought to prove

anything to the contrary of what they thus showed or attempted to show. We have confined our case to that which showed the intentions of Hanway alone; though showing incidentally, perhaps, at the same time what induced other individuals to assemble on the morning of the 11th. We have kept our evidence within certain limits, and shown our case in a particular way. We may contend, it is true, and as a defence on the outworks, that the prosecution has not shown treason at all; but our real and our individual position is on more confined ground; and we shall contend that whether other persons did or did not commit treason, is unimportant, since Hanway was neither of their number nor counsel. Now the evidence offered is not in rebuttal of anything confined to the exculpation of the particular individual. Our objection is substantial. It is unfair to bring the principal part of the case upon the rear of a defence full and complete to all that has been presented as requiring an answer. The case that ought to be heard by the jury first, would be thus made to be heard last, and operates with the effect of the most recent impression. If there were no legal and substantial objections, the act of congress obliges the prosecutor to furnish to the prisoner the names of his accusing witnesses in chief, three days before his trial. Its provisions cannot be defeated by this mere shift of position.

Counsel for the United States. The evidence on the part of the prosecution closed, relying upon the prima facie case which was made out; st. the evidence of concert throughout the neighbourhood; that notice has been sent to Christiana from Philadelphia, by Williams, who accompanied some of the officers employed by Mr. Gorsuch; that the names of Mr. Gorsuch's slaves were left on a piece of paper in the neighbourhood of Christiana; that armed men, some on foot, some on horseback, were instantaneously assembled by a concerted signal; and that Hanway was there, and came there, to all appearances like the others. This was prima facie evidence of treason, and enough to connect the prisoner with it. The counsel of the defence had an opportunity of saying it was not treason, and that there was a total failure of evidence necessary to establish that crime. But they go on to make a defence: and what is that defence? Why, confessing the fact that there was organization; that horns did sound to summon armed bands to the rescue; they have referred the origin of that organization to lawful motives—the exercise of a fair and natural right—their own protection. They have gone on, therefore, to explain the motive of this organization, and to say it was not for the purpose of resisting the law, in the reclamation of slaves, but to prevent illegal violence to those who are free. Are we not to rebut that allegation? And if in rebutting it, we introduce evidence which

might have been admissible in chief, if notice had been given, is it to be excluded? The only inquiry in regard to this rebutting proof is, whether it is strictly rebutting? Does it not, then, destroy the allegation of motive on which the defence rely? We offer it only to rebut that; and, so limiting it, we are entitled to it as rebutting evidence.

GRIER, Circuit Justice. There is a great difference between rebutting evidence and evidence by way of set-off. The statute gives a man accused of treason, (an offence involving terrible consequences,) a particular protection about testimony; but if testimony such as this could be brought in by way of rebuttal, the provision of the statute, (not more humane than just), would in effect be evaded. You cannot evade it by changing the order of proof. On general grounds, also, everything tending to show that there was an intention to make public resistance to a particular law, was evidence entirely in chief, and not at all rebutting anything. It should have been given in evidence in chief: and to draw an illustration from the game of whist, if you gave it now, you would be reneging and keeping your trump back to the last trick. I do not know, indeed, but that the testimony offered might prove directly the contrary of that which it is designed to prove, and only show that there was a band of runaway negroes consociated to help each other to resist their master, who came to reclaim them. And this would not be such public resistance to the law as to be called treason.

KANE, District Judge. I concur with Judge GRIER entirely. The two elements of the crime are the act and the preconcert. It is for the prosecution to make out both, and by omitting evidence of preconcert, they fail in their original case. The evidence which is now offered is merely to prove that preconcert. It was an indispensable element of the original case. It seems to me, therefore, that it cannot be introduced as rebutting evidence. It is one of the matters going to prove the charge laid in the indictment, in regard to which the act of congress is express, that it shall only be proved by those witnesses of whom three days' notice has been given to the other side.

### The principal case resumed.

The bill of indictment charged that the prisoner, Hanway, wickedly intending and devising the peace and tranquillity of the United States to disturb, and prevent the execution of the laws thereof, to wit. "An act, &c.," and another act, supplementary to the same, passed on the 18th September, 1850, did on the 11th of September, 1851, wickedly and traitorously intend to levy war against the United States. It then sets forth five several overt acts:

(1) That with a large number of persons

armed and arrayed with warlike weapons, with purpose to oppose and prevent, by means of intimidation and violence, the execution of the said laws, he did wickedly and traitorously levy war against the United States. (2) That in pursuance of said purpose, the prisoner and others so armed and traitorously assembled to prevent the execution of said laws, did with force and arms traitorously resist Kline, an officer of the United States, duly appointed, from executing lawful process, and wickedly and traitorously did prevent by force and intimidation, the execution of the said laws. (3) The third was the same as the second, with this addition, that they assaulted Kline, and liberated from his custody persons arrested by him, who owed service and labour to Edward Gorsuch under the laws of Maryland, thereby traitorously preventing the execution of said laws. (4) That the prisoner, with the others, did traitorously meet, conspire, and consult to oppose, resist and prevent by force the execution of said laws. (5) That in pursuance of said traitorous intention, he prepared divers books, letters, resolutions, addresses, &c., which he caused to be dispersed, containing incitements and encouragements to fugitives and others to resist, oppose and prevent by violence and intimidation the execution of said laws.

J. W. Ashmead, U. S. Dist. Atty., G. L. Ashmead, and J. R. Ludlow represented the United States. R. J. Brent, Atty Gen. of Maryland, James Cooper, a senator of the United States for Pennsylvania, and R. M. Lee, of Philadelphia, appeared as special counsel,—Mr. Brent, by order of the governor of Maryland (of which state Mr. Gorsuch was a citizen); Mr. Cooper and Mr. Lee, as private counsel of Mr. Gorsuch's relatives. J. J. Lewis, of West Chester, T. Stevens, of Lancaster, J. M. Read, T. Cuyler, and W. A. Jackson, of Philadelphia, for the prisoner.

For the United States. Levying war against the United States, is a phrase, the meaning of which is settled, both in England and the United States. The statute of 25 Edw. III., c. 2, contains seven descriptions of treason, and two of them are thus stated by Blackstone (Comm. bk. 4, c. 6, §§ 3, 4). (1) If a man do levy war at our lord the king in his realm. (2) If a man adhere unto the king's enemies in his realm, giving to them aid and comfort in the realm or elsewhere. These are the two kinds of treason, which are defined in the constitution of the United States, and the words used to describe them are borrowed from the English statute, and had a well known legal signification at the time they were used by the framers of our constitution. This is stated by Chief Justice Marshall (2 Burr, Tr. 402), his language being that "it is reasonable to suppose the term 'levying war' is used in that instrument in the same sense in which it is understood in the English law to have been used in the statute of 25 Edw. III." He then adds "that principles laid down by such writers as Coke, Foster and Blackstone, are not lightly to be rejected." He then defines (Id. p. 408) in what levying war consists; viz. "That where a body of men are assembled for the purpose of making war against the government, and are in a condition to make war, the assemblage is an act of levying war." There is no dispute that English writers maintain the doctrine that any resistance to an act of parliament by combination and force, to render it inoperative and ineffective, is treason by levying war. We need not however go into a consideration of the English law of treason, or of what in England, is "a levying of war." The matter is settled by our own decisions. In the Cases of the Western Insurgents, in 1795,[2] Judge Patterson says: "If the object of the insurrection was to suppress the excise office, and to prevent the execution of an act of congress by force and intimidation, the offence in legal estimation is high treason; it is an usurpation of the authority of the government. It is high treason by levying war." In Fries' Case [Case No. 5,126], Judge Iredell, in his charge to the grand jury (A. D. 1799), says: "I am warranted in saying, that if in the case of the insurgents who may come under your consideration, the intention was to prevent by force the execution of any act of the congress of the United States altogether, any forcible opposition calculated to carry that intention into effect, was a levying of war against the United States, and of course an act of treason. But if its intention was merely to defeat its operation in a particular instance, or through the agency of a particular officer, from some private or personal motive, though a high offence may have been committed, it did not amount to the crime of treason. The particular motive, must however, be the sole ingredient in the case, for if committed with a general view to obstruct the execution of the act, the offence must be deemed treason." This was the charge of Judge Iredell to the grand jury. Fries having been indicted by them, was tried before Judges Iredell and Peters, who iterate the doctrines just above declared. Judge Peters says: "It is treason in levying war against the United States for persons who have none but a common interest with their fellow-citizens, to oppose or prevent by force, numbers or intimidation, a public and general law of the United States, with intent to prevent its operation, or compel its repeal." Fries' Case [supra]. Again, "although but one law be immediately assailed, yet the treasonable design is completed, and the generality of interest designated by a part assuming the government of the whole. * * * Though pun-

2 U. S. v. Vigol [Case No. 16,621]; U. S. v. Mitchell [Id. 15,788]; s. c. Whart. St. Tr. 175, 176, 182.

ishments are designated by particular laws for certain inferior crimes, which if prosecuted as substantive offences, and the sole object of the prosecution, are exclusively liable to the penalties directed by those laws, yet when committed with treasonable ingredients, these crimes become only circumstances or overt acts. The intent is the gist of the inquiry in a charge of treason." Judge Iredell referring to the law laid down by Judges Paterson and Peters in the Cases of the Western Insurgents [Id. 17,-437], says: "As I do not differ from that decision, my opinion is that the same declarations should be made upon the points of law at this time." On the second trial of Fries, in 1800 [Id. 5,127], Judge Chase was on the bench, and in an elaborate opinion he maintains the doctrine which had been ruled in the previous cases. Judge Story, in 1842, says (1 Story, 614): "It is not necessary that it should be a direct and positive intention entirely to overthrow the government. It will be equally treason if the intention is by force to prevent the execution of any one or more of the general and public laws of the government, or to resist the exercise of any legitimate authority of the government in its sovereign capacity. Thus, if there is an assembly of persons, with force with intent to prevent the collection of taxes lawful, or duties levied by the government, or to destroy all custom-houses, or to resist the administration of justice in the courts of the United States, and they proceed to execute their purpose by force, there can be no doubt it would be treason against the United States." President King of the common pleas of Philadelphia holds the same doctrine (charge on the occasion of the Kensington riots, MS.). His language is, "that where the object of a riotous assembly is to prevent, by force and violence, the execution of any statute, or by force and violence to compel its repeal by the legislative authority, or to deprive any class of the community of the protection afforded by law, as burning down all churches or meeting-houses of a particular sect, under colour of reforming a public grievance, or to release all prisoners in the public jails and the like, and the rioters proceed to execute by force their predetermined objects and intents, they are guilty of high treason in levying war." The case of U. S. v. Hoxie [Case No. 15,407] is no exception to these principles. It was clearly no case of treason, but simply of a private outbreak.

The authorities and opinions quoted, thus prove that the forcible resistance to the execution of the fugitive slave law, in which the defendant participated, if designed to render its provisions inoperative and void, was treason against the United States. It was a levying of war within the meaning of the constitution. The intent with which the act was committed, is the essential ingredient in the offence. We have then an uninterrupted line of decisions from the foundation of our government, until the present hour. It is unprofessional, and will be vain to attempt to discredit these earlier decisions on the law of treason. They have the force of that contemporanea expositio quæ fortissima est. The seats of judgment were never filled by abler, more learned, or purer men. The bar was never graced by more splendid talent, more intellectual force, greater devotion or more practised advocacy. Upon the bench were Marshall, Paterson, Iredell, Chase and Peters! At the bar was William Bradford, Sitgreaves, Lewis, the elder Dallas, and the elder Rawle, Edward and William Tilghman. Never were cases more eloquently, more cogently, more learnedly argued, or with greater interest of every kind. Never were cases more temperately, more clearly and more properly adjudged! Treasonable designs must, in the nature of the case, be often inferred from the facts and circumstances which attended the transaction. The combination or conspiracy of the defendant with others, forcibly to resist the law at Christiana, can be established without direct proof. "The concert of purpose," says Judge Kane [charge to the grand jury on the law of treason, Fed. Cas. Append.], "may be adduced from the concerted action itself, or it may be inferred from facts occurring at the time or afterwards, as well as before." It is not to be expected, that direct proof shall be brought, where a whole region is infected. We cannot enter a horde of traitors, and take thence voluntary witnesses to implicate directly those who think and feel as they do themselves. Because a whole county, a whole township, or a whole neighbourhood, are involved in plotting treason: and no eye-witness can be produced to prove their treasonable meetings, cannot treason be proved? cannot combination and wicked conspiracy be established, as any other fact in the law, by circumstantial evidence? If you see the stream which comes from the distant mountains, swollen and leaping along as if a deluge were pouring its waters through its channel, do you not know that the snows have melted at its source, and the rains have descended from the heavens? Cannot you judge the cause from the effect? You see that the prisoner was ready to leap upon his horse as rapidly as possible, and go to the ground, to incite those who are assembling by concert to resist the laws; can you not infer that he went there by pre-arrangement, and that he was known by the coloured people as a man who would stand by them, in their resistance of the laws? You see them hail his presence with a shout, and see him stand by and read the process of the United States, saying not one word to these ignorant, misguided individuals, warning them of their danger, "though he had come to see justice done" to the blacks. He will not tell these ignorant people, who were about to imbrue their hands in innocent blood. "You are doing wrong, here is authority from the United

States." Can you not infer concert and design from these things? Indeed there is no necessity for inferential proof, so far as this defendant is concerned. His resistance to the law was declared. He avowed his determination on the spot, not to regard the provisions of the fugitive slave law, or any other act of congress upon that subject, and in the presence of an armed band of negroes who had come together to resist the law, he declared that its supremacy should not be maintained by him, and that the rights of these insurgents were superior to any statute of the United States. This man did not confine himself to mere sympathy, nor occupy a position merely passive; he was already connected with an organized band, which had been formed for treason. But suppose he was there as a spectator, and that he there first connected himself with an organization formed for the purpose of resisting the law. Is he not as guilty as the rest? But he had no arms in his hands! What of that? The coloured people then and there armed, were his instruments of war; they were his arms. If, while sympathizing with these blacks, and determined to resist this law, Hanway and Lewis had put on their armour and led their soldiers to the fight, they would have been at least heroes in their way. But to go there with no arms, to incite an ignorant and infuriated horde, who are there for the purpose of treason, murder and robbery; this is less manly, but no less treasonable. If Hanway incited them by word, speech, gesture, or presence, then he has done more than merely refuse to assist—he has become a conspirator. He has connected himself with them, their acts are his acts, and their intentions are his intentions.

For the prisoner. If the issue were on the fugitive slave law, and the question was, whether Hanway disapproved it? he could not be convicted even of that. There is no certain evidence which shows that he has an opinion about that law. Admitting that he disapproved the law, as he had a right to, there is no evidence which shows what motive brought him to this spot on the morning of the 11th. The sounding of a horn about breakfast time (an usual signal in the country for breakfast) shows nothing; and if it were clearly shown to be a signal for concourse, it follows not that it was a concourse for a treasonable purpose. There is evidence that there was in the neighbourhood a gang of professional kidnappers, who, on recent occasions, without any authority, had seized black men and carried them away, so that they were never heard of again. And that in consequence of this, there was a general alarm and feeling of indignation in the neighbourhood—not against lawful authority, but against man-stealers. Lewis was informed exactly, that there were "kidnappers at Parker's house," and he gave that information and none other to Hanway. And it

does not matter, that by the word "kidnappers" slave owners were sometimes called, since there had recently been people in the neighbourhood to whom the word strictly and legally applied. Now who can say on the evidence what took Hanway to this spot? It is the intent which here is every thing. For if Hanway came there with a lawful intent, it is no treason, even though he did afterwards see with composure the laws violated, or even commit a murder.

Treason in China, means disrespect to the emperor. On the continent of Europe it has been reduced by the intrigues of faction, or the command of power, to about the same thing. In England there have been bad times, and the law has given way to party rage and power. At all times, indeed, their law of treason has confessedly been more extended than ours, and largely influenced by the ruling authorities. But the fathers of our government, deeming the life and liberty of the citizen of too much moment to be subjected to the sport of factious excitement, or to the spirit of power, have made the definition of treason a part of the paramount law, which every federal officer is sworn to support. This definition is short, plain, and precise; involved in no phrases of dubious import, or of technical subtlety. To the layman and way-faring man it simply declares what is treason. To the lawyer and the scholar, bewildered in the mazes of the metaphysical jargon with which judicial butchery, in violent times, racked their brains for reasons for doing wrong; to the judge and the juryman in admonition of the duty of discarding bad precedents and of abstaining from the extension of crime by construction, it does more; it declares what is not treason. Const. art. 3, §§ 1, 3. "Treason against the United States, shall consist only in levying war against them, or in adhering to their enemies, giving them aid and comfort." This definition was framed by men who, in the exercise of the right of revolution, had risked the penalties of treason, and studied the subject on the steps of the scaffold. Indignant at the wrongs that had been perpetrated, and the blood that had been shed for fictitious offences made treason by ingenious construction, they determined to deprive both faction and power of so potent an engine of mischief, long used and abused by demagogues and despots. They cut off at one blow, that once flourishing and fatal branch of interpretative treason. They defined the crime by terms severely strict and rigorously exact. Every word is significant. There is not a syllable to spare, nor one on the meaning of which sophistry can hang a doubt. "Treason shall consist only in levying war, &c." No court, no legislature, no power in the state shall make any thing else treason. The same words which gave to the acts enumerated the highest denomination in the catalogue of crimes, contain an emphatic prohibition against the

slightest extension. The offence requires the existence of war. Its sole element is war. It cannot be committed in time of peace. To be guilty of the crime, a person must be actually engaged in the war, or giving aid to those that are. To contemplate, or to advise war, or even to conspire to wage it, is not enough. The war must be actually levied. It must not be a mere tumult—a fight—a struggle in arms between individuals or companies, or violence offered to an executive or military officer of the government, in a matter relating only to individual interest or private right, but it must be national in its scope and object. It must possess that dignity in mischievous design that aims at the life of the government, or at least at the prostration of some branch of its power, by an armed opposition. It must have the impress of universality. A contest between the lords of neighbouring manors, involving the destruction of many lives by small armies, raised and maintained for the purposes of mutual revenge and plunder, was decided even by an English court, in violent times, to be no treason. An attack on the negro population of a town or city, by an armed mob of a thousand, such as have occurred in different parts of our country at different times, has never been supposed to be treason. A combination to destroy a newspaper press by violence, and to overcome all opposition by arms, and the purpose executed, as happened formerly in Baltimore, when the Federal Republican press was destroyed, General Lingan killed, and a number of other persons grievously injured; though the mob held possession of the city for days, overawed the police, and set the municipal authorities at defiance, was deemed no more than misdemeanor. The driving of the peaceable Mormons from the city of Nauvoo, at the point of the bayonet, and with no inconsiderable slaughter too, though battles were fought and a siege maintained, passed unnoticed by the United States government, as an offence cognizable only by the local tribunals. The same remark applies to the Philadelphia riots of 1844, when churches were burnt and houses destroyed, streets barricaded, and windows shaken by the thunder of artillery launched in civil strife, and a population of near half a million of persons stricken with terror, and forced to call on the country for protection. Such cases, though wearing much the appearance of war on a limited scale, and possessing many of its characteristic features, do not amount to war, in the constitutional sense, as generally received and understood

Upon the question, what constitutes a levying of war, there have been several determinations in the federal courts. The first occasion that occurred for its consideration, was that of the Western insurrection in 1794, five years after the constitution was adopted. The second was Fries's Case, or the Northampton insurrection, only five years later.

The government in these times was new, the treasury exhausted, and the nation comparatively weak. The trial of the great experiment of a constitutional republic was considered of doubtful success, and was watched with earnest solicitude by the statesmen of the day. The value of the Union was still a debateable subject. Reverence for the constitution had not become a common sentiment. We were in the midst of the old French revolution, "when," as the jurors say, in asking a copy of Judge Iredell's charge to them (Fries' Case [Case No. 5,126]), "false philosophy and the most dangerous and wicked principles were spreading with rapidity, under the imposing garb of liberty, over the fairest countries of the old world." In every speck of disaffection there was danger. Every open opposition to the regular action of the government, furnished just cause for alarm. The federal authority was in the hands of men who held high-toned opinions, and who were disposed to carry out these opinions, in the exercise of their official functions. The judges had been educated in the English law, and naturally looked for their guides to the precedents which that law furnished, and which were established in dark and remote periods, and could not anticipate the more liberal and enlightened sentiments which have since animated English jurisprudence. Under such circumstances we should reasonably expect to see strong ground taken and strong doctrine promulgated. And such we find actually to have been the case. Under different circumstances the law might have been, and probably would have been, differently ruled; or general principles laid down less broadly. As it was, they gave great dissatisfaction, and have been subjected to severe criticism by learned commentators. Still, as far as they bore upon the particular circumstances under investigation, in application to the facts proved by the evidence in the several cases, they may perhaps be safely admitted to have the force of precedents. But they are not to be received as bearing upon a case varying in any material point from those in hand.

The Western insurrection was an extensive combination, embracing great numbers of the inhabitants beyond the Alleghany mountains, not only of the state of Pennsylvania, but of Virginia also, to resist by force the execution of an excise law of the general government. It commenced in 1791, and continued till 1794. It was originated and fomented and supported by what was called sometimes the "Anti-Federal or Republican," and sometimes the "Jacobin or Democratic," party. It was composed of men who like Gallatin and others represented by the "Aurora," had opposed with the utmost violence the adoption of the federal constitution, and who, after its adoption, sought to paralyse and destroy its operation; men who hated the person and opposed the administration of Washington, whose history yet remains

to be written, "The Enemies of Washington," and who in pursuance of their objects, sought in theory and in fact to overthrow the government. The party had not then,— adopting the federal constitution,—sought to qualify its operation by a jealous construction. They had opposed violently its adoption. Failing in this, they sought, when it was adopted, to nullify its operation; which was to overthrow it in fact. Application was made to congress for a repeal of the obnoxious act. That having failed, resort was had to force, and within the disaffected territory the excise law was as effectively annulled as though it had been repealed by congress. Even those who were disposed to obey it, were prevented through the terror of the insurgents. Proclamations were issued by the president; requisitions were made on the militia of New Jersey, Pennsylvania, Maryland, and Virginia; and our army, composed of several divisions, and commanded by an officer of high military reputation, was marched into the disaffected region, and a considerable force under General Morgan was left to occupy it as a conquered country. It was in view of such circumstances that the language quoted by the prosecution, was employed. Judge Paterson declared that the object of the insurgents "was of a general nature, and of a national concern." The magnitude of the effort was in proportion to that of the object, and required no inconsiderable exertion of the force of the nation to defeat it; it was therefore deemed a war, and those that waged it in opposition to the national authority, traitors.

The Northampton insurrection out of which Fries's Case arose, had much the same origin, though the rebellion was not of equal extent; and owing to the prompt and efficient action of the government, did not become so formidable. Three large counties, however, were engaged in the opposition, which assumed an aspect sufficiently threatening to require the interposition of the military force. The legislature of Pennsylvania resolved to co-operate with the general government, in case it should become necessary, and the authority of the executive of the state, as well as of the Union, was actively exerted to suppress the spirit of resistance. The object of the insurgents was to obtain a repeal of the house and direct tax law; they proceeded to acts of violence, and they succeeded in impressing the public with the opinion, or at least the apprehension, that they had sufficient power to effect their purposes. It was in reference to such circumstances that the judges delivered the charges quoted by the prosecution. They did not decide that these circumstances constituted a levying of war, but they presented the case in such a way as gave a pretty clear intimation of their opinion, and on a precisely similar state of facts, those opinions would operate with great weight. Still the general expressions are to be applied to the cause then

in hand, and not to a cause altogether differently constituted.

The report of the Fries Case makes Judge Peters say: "It is treason in levying war against the United States, for persons who have none but a common interest with their fellow-citizens, to oppose or prevent by force, numbers, or intimidation, a public and general law of the United States, with intent to prevent its operation, or compel its repeal;" and this passage is torn from its context, and presented here by the counsel of the United States, as an authoritative exposition of the law of treason. The force of the language is more readily perceived by rejecting all superfluous words, throwing out such members of the sentence connected by the disjunctive conjunction, as obscuring the point, and making a somewhat different collocation of those retained, by placing the verb and the object nearer together. Thus: "It is treason, in levying war against the United States, to oppose by intimidation a general law, with intent to prevent its execution." This is the concentrated sense of the passage, and if it is to be considered as announcing a general principle, applicable to all cases, as the prosecution would have us suppose, it is to be taken as declaring that levying war, in the meaning of the constitution, does not require force, but only intimidation, and that the intent with which the intimidation is used, need not go beyond the prevention of the execution of a law of congress, in any particular instance. The words are without qualification. To smuggle goods is to prevent the execution of the revenue laws, and to threaten an officer of the United States, attempting to execute those laws, so as to intimidate him, would be treason, if this is all that would be required to constitute it. Even to prevent a United States marshal by intimidation from summoning a juror to attend this court, would, according to this construction, amount to the same offence. But this was not the meaning of Judge Peters. He spoke in reference to the facts before him, the means used and the object avowed. He intended merely to recognize the decision in the Case of the Western Insurgents [Case No. 17,437], and to do no more, for he says in immediate connection with the passage excerpted from his opinion: "Force is necessary to complete the crime, but the quantum of force is immaterial. The point was determined by this court on a former occasion, which was, though not in all circumstances, yet, in principle and object, very analogous to' the subject of our present inquiries. I hold myself bound by that decision, which, with due consideration, I think legal and sound." What that decision was, we know; for the facts have become a subject of history: and the decision was, that there was a levying of war within the meaning of the constitution. But what the charge of the court was, we do not know. We have no report of it, but only of what

is said to be its substance. We have not the language of Judge Paterson, and who can say that there has been no transmutation in the process of condensing; or, that the meaning has been faithfully preserved, while many of the words that conveyed that meaning have been omitted, and the phraseology changed? As the book has it, he says: "The first question to be considered, is what was the general object of the insurrection? If the object was to suppress the excise offices, and to prevent the execution of an act of congress by force and intimidation, the offence in legal estimation is high treason. It is an usurpation of the authority of the government. It is high treason by levying war; taking the testimony in a national and connected point of view. This was the object. It was of a general nature and of national concern." Western Insurgents' Case [supra]. In this description of the offence, we recognize nothing of the accuracy or finish, which characterize the productions of that jurist, and it is most certain, that it does not embody his whole meaning. For it cannot be doubted that an insurrection to suppress the excise offices of a limited district of country, and to prevent the execution of an act of congress therein, through a spirit of private revenge, with a view to individual interest, or for purposes of plunder, though by force and intimidation, would not amount to a levying war, and would not be treason; and it is an imputation upon the impartiality of the judge, to suppose that he was not careful in describing the crime of which the defendants were accused, and to attribute to him an omission in that description of the main ingredient of the offence—the intent with which the overt acts were done. All that we have therefore in relation to the subject of levying war, in the reports of the trials of the Western Insurgents, and of Fries, in the Northampton Case, is very little, and that little of no authority, beyond the cases decided. When such cases occur again, but not before, they will be precedents.

I leave out of view the charges to grand juries, from which the prosecution has made quotations, because they do not possess the character of authority; and though entitled to respect as the opinions of eminent men, are entitled to no more respect than the opinions of other men equally or much more able, who have never held judicial positions. Such charges are delivered without the benefit of argument by counsel, and only as guides to an inquiry preliminary to the trial. The charge of Judge Chase to the jury, in the second trial of Fries, may be put in much the same category as charges to grand juries; as by his arbitrary conduct on the trial, he drove the counsel for the prisoner out of court, and deprived himself of the assistance which he might have received from their arguments, in interpreting the law. It is pertinent however to remark, that in his statement of the law, he has been more precise, exact and definite, than either of the judges whom the prosecution has quoted. "It is," says he, "the opinion of the court, that an insurrection or rising of any body of the people, to prevent by force or violence, any object of a great public nature, of public, general, or national concern, is a levying of war against the United States, within the contemplation and construction of the constitution." And he takes the precaution further to observe: "The court are of the opinion, that the assembling of bodies of men armed and arrayed in a warlike manner, for purposes only of a private nature, is not treason, although the judges, or other peace-officers, should be insulted or resisted, or even great outrages committed to the persons or property of our citizens." The prosecution has referred to this opinion without reading it. It happens not to fall into their line of argument so well as the looser phraseology, attributed to Judges Paterson and Peters. Its terms are still very general, and they need the illustration which is furnished by the facts to which they were applied. Those facts have been already adverted to. A wide spread disaffection existed. Formidable preparations were made to resist the law by force in three counties, and actual resistance had been made, yet the court in the Case of Fries, has been universally considered as having carried the law of treason to the utmost allowable limits, if it has not surpassed them.

Mr. Luther Martin, in his argument on Burr's trial, after proving by authority, "that an assemblage of men, even armed in military array, is not to be considered as treasonable, unless their intention be proved to be treasonable, that is (applying the doctrine to this country), unless the intention be to subvert the government of the United States," uses this strong language. "Sir, I execrate a contrary doctrine as highly tyrannical and oppressive. And here I beg leave to enter my censure against the decisions of the court of Pennsylvania on this subject, in the cases of what were called the whiskey and hot water insurrections. Some of them were decided, in my opinion, improperly, to be guilty of treason, according to the constitution of the United States. * * * I think it my duty to enter my solemn protest against the decision of the court in those cases, although made by gentlemen of learning and integrity; and if ever the question should come before the supreme court, I will endeavour to show that those decisions were illegal and improper. In those cases there was no design to subvert the government. Such a thought was not entertained. It was the expression of their disapprobation of a particular law, and an opposition to the execution of that unpopular law, and the intention of those people went no further than to induce its re-

peal. But according to the authority already referred to. though war was levied with all the solemnities of actual war, though violent acts were committed and a number of people killed, yet the parties engaged in it would be only guilty of a great riot, or at most, of murder, but not of treason, on this principle. that their intention was not treasonable, that the subversion of the government was never in their contemplation."

In U. S. v. Hoxie [Case No. 15,407], in 1808, Judge Livingston cites the Western Insurgent Cases and Fries's Case, without approbation, and draws broadly the line of distinction between such public systematised insurrections as threaten the existence of the government, and those minor offences, which partake more or less of opposition to the laws of the United States, but which from their suddenness, imbecility, and want of organization, are incapable of making a serious impression upon the peace of the nation.

In Fries's Case [Id. 5,126]. Judge Chase has drawn his description of treason from the English authorities, but has omitted those specifications which assist to explain the sense of the commentator and limit the application of the terms employed, and it is useful, therefore, to refer to those authorities for a more definite idea of what is meant by levying war. Lord Hale says (1 P. C. 149, 150): "An actual levying of war against the king, consists of two principal parts or ingredients, namely: First, it must be a levying of war; second, it must be a levying of war against the king. What shall be said to be a levying of war is partly a question of fact. For it is not every unlawful or riotous assembly of many persons to do an unlawful act, though de facto they commit the act they intend, that makes a levying of war, (for then every riot would be treason, and all the acts against riotous and unlawful assemblies had been vain and needless,) but it must be such an assembly as carries with it speciem belli; as if they ride or march vexillis explicatis, or if they formed into companies, or were furnished with military officers; or if they are armed with military weapons, as swords, guns, balls, halberts, pikes, and are so circumstanced, that it may be reasonably concluded they are in a posture of war."

The language of Justice Foster (Crown Law, p. 209), though not so particular in the enumeration of the circumstances necessary to constitute a levying of war in the sense of the statute, is to the same general effect. And he adds, that an insurrection to throw down all inclosures in a particular place or county, to pull down all brothels in a particular town, or to remove a local nuisance, is not such an insurrection as amounts to a levying of war.

The last decision in the American courts is that in U. S. v. Hoxie, already mentioned.

In that case Vandusen had sent a raft of timber to be transported to Canada, in violation of the embargo laws. It was seized on its way by the collector of Vermont, and placed in the custody of a company of militia. While the company were at some distance from the raft, a company of about fifty men, hired for the purpose, and armed, some of them with a dozen muskets, and the rest with clubs and spike poles, assembled with the intention of rescuing the raft, and if necessary, of making prisoners of the troops that guarded it. They got possession of the raft without resistance, no one being near it, and proceeded towards Canada. In about an hour, as the raft passed a point of the shore twenty rods distant, the troops fired upon it, and those on the raft returned the fire. This firing continued until the raft was beyond the reach of musket shot. About one hundred shots were fired from the raft, and the balls struck trees on the shore, and the shot from shore also struck the raft, but no persons were wounded. The firing was in earnest, and intended for execution. Here was a combination of men to prevent the execution of an act of congress by force, the authority of the United States successfully resisted, and the occurrence of an actual skirmish between an armed body and troops in the service of the nation sent to defeat the unlawful enterprise. Not a single ingredient of treason is wanting as the prosecution expounded the word: yet the court decided that the offence was not treason. "A levying of war," says Judge Livingston, "without having recourse to rules of construction or artificial reasoning, would seem to be nothing short of the employment, or at least, of the embodying of a military force, armed and arrayed in a warlike manner, for the purpose of forcibly subverting the government, dismembering the Union, or destroying the legislative functions of congress. These troops should be so armed and so directed as to leave no doubt that the United States or their government were the immediate object of their attack."

Before GRIER, Circuit Justice, and KANE, District Judge.

GRIER, Circuit Justice (charging jury). [3] [We must commend the patient attention which you have thus far given to this most important and interesting case. It has taken up much of your time, and caused you some personal inconvenience, but not more, perhaps, than the importance of the issue, both as respects the interests of the public and your duty to the prisoner whom you have in charge, has necessarily required. It has been the anxious desire of the court, notwithstanding the pressure of other duties, to give ample time and opportunity for

---

[3] [From 4 Am. Law J. (N. S.) 458.]

the careful and full investigation of the facts and law bearing on the case, not only because it is the first of a numerous list of cases of the same description, which involve the issue of life and death to the parties immediately concerned, but because we know that the public eye is fixed upon us, and demands at our hands the unprejudiced and impartial performance of the solemn duties which we have been called to execute. The prisoner at the bar has a right to require of you that you should not permit the atrocity of the transaction, or your horror of the offence with which he is charged, or your proper desire to vindicate the insulted laws of the country, to cause you to forget your duties to him, and convict him without full and satisfactory proof of his guilt. The government, also, while it cannot desire the sacrifice of an innocent individual for the purpose of public example, has a right to demand of you a firm, a fearless, an unflinching performance of your duty, and that the verdict you shall render shall be a true verdict, according to the evidence which you have heard, and the law as explained to you by the court.

[Before proceeding to notice more particularly the questions of law or fact arising in this case, or the defendant's complicity in the transaction, suffer me to advert to some matters, which, though only historically known to us, yet having passed before our eyes as citizens of the commonwealth, may have a tendency to create in our minds some bias on this subject, but which should not be permitted to affect your verdict, whatever your private sentiments and feelings may happen to be. Without intimating any opinion as to the guilt or innocence of the prisoner at the bar, it must be admitted that the testimony in this case has clearly established that a most horrible outrage upon the laws of the country has been committed. A citizen of a neighboring state, while in the exercise of his undoubted rights guaranteed to him by the constitution and laws of the United States, has been foully murdered by an armed mob of negroes. Others have been shot down, beaten, wounded, and have, with difficulty, escaped with their lives. An officer of the law, in the execution of his duty, has been openly repelled by force and arms. All this has been done in open day, in the face of a portion of the citizens of this commonwealth, whose bounden duty it was, as good citizens, to support the execution of the laws without any opposition on their part, without any attempt at interference to preserve the peace; and who, if they did not directly encourage or participate in the outrage, looked carelessly and coldly on. These, I say, are facts established in this case beyond contradiction. That it is the duty, either of the state of Pennsylvania, or of the United States, or of both, to bring to condign punishment those who have committed this flagrant outrage on the peace and dignity of both, cannot be doubted. It is now more than sixty years since the adoption of the constitution of the United States. Under its benign influence we have become a great and powerful nation; happy and prosperous at home, feared and respected abroad. And why has this Confederacy obtained such an immeasurable superiority over the other republics on this continent? It is because here we have a moral, virtuous, and a religious people, and a firm, fearless, and impartial administration of the laws; because, here, the minority upholds the constitutions and laws imposed by the majority; because we have not here pronunciamentos, rebellions, and civil wars, caused by the lust of power, by the ignorance of faction or fanaticism, which in other countries have marred every attempt at free government. That the people of the great state of Pennsylvania have a loyalty, fidelity, and love to this Union, and the constitution and laws which have so exalted us as a nation, cannot be doubted; and yet I grieve to admit that the only trials and convictions on record for armed and treasonable resistance to the laws of the United States since the adoption of the constitution have their venue laid in Pennsylvania. But these were more than fifty years ago, and before we had become accustomed to the working of a new and untried experiment in self-government, or anticipated its glorious results. It is not our purpose to excuse or vindicate those early outbreaks of popular insubordination, which were soon suppressed by military force, and the impartial execution of the laws by courts and juries. But without, at present, expressing any opinion whether the present outrage is to be classed under the legal category of riot, murder, or treason, we think it due to the reputation of the people of this commonwealth to say that (with the exception of a few individuals of perverted intelligence, some small districts or neighborhoods whose moral atmosphere has been tainted and poisoned by male and female vagrant lecturers and conventions,) no party in politics, no sect of religion of any respectable numbers or character, can be found within our borders who have viewed with approbation, or looked with any other than feelings of abhorrence, upon this disgraceful tragedy. It is not in this hall of independence that meetings of infuriated fanatics and unprincipled demagogues have been held to counsel a bloody resistance to the laws of the land. It is not in this city that conventions are held denouncing the constitution, the laws, and the Bible. It is not here that the pulpit has been desecrated by seditious exhortations, teaching that theft is meritorious, murder excusable, and treason a virtue. The guilt of this foul murder rests not alone on the deluded individuals who were its immediate perpetrators, but the blood taints with even

deeper dye the skirts of those who promulgate doctrines subversive of all morality and all government. This murderous tragedy is but the necessary development of principles and the natural fruit from seed sown by others, whom the arm of the law cannot reach.

[In making these remarks, we prefer to speak the truth in plain language, without seeking for bland euphuisms or flattering terms of respect for the promulgators of principles which we verily believe are not only dangerous to the peace, prosperity, and happiness of the citizens of these United States, and tending to the dissolution of the Union, but subversive of all human government. I have adverted to these matters, which must have forced themselves on our minds and attention before the commencement of this trial, in order to warn you also against suffering them to bias your minds in this case. This defendant must stand or fall by the evidence in the cause, and not be made the scape-goat or sacrifice for the offences of others, unless he be proved to have participated in them. But if that shall have been made to appear by the evidence, it will be no excuse or defence for him that others are equally guilty with himself. It is due to him, however, to say that there is no evidence before us that the prisoner attended any of these conventions got up to fulminate curses against the constitution and laws of the country, to libel its best citizens, and to exhort to a seditious and bloody resistance to the execution of its laws. You will have observed that this bill of indictment charges the defendant with treason in resisting the execution of a certain law of congress concerning fugitives from labor, which has been the subject of much controversy and agitation, and on which it may be proper to make a few remarks before we proceed to the more immediate merits of the case.

[The learned counsel for the prisoner, having a due regard for the high character which they sustain in their profession, have not made the objection to this law which has been so clamorously urged by many presses and agitators, that it is unconstitutional. It is true some ecclesiastical assemblies in the North, treating it, we presume, as a question of theology or orthodoxy, have ventured to anticipate the decision of the legal tribunals on this subject. But, highly as we respect their opinions on all questions properly within their cognizance, we cannot receive their decisions as binding precedents on questions arising under the constitution.

[The constitution enacts that "no person held to service or labor in one state under the laws thereof, escaping into another, shall, in consequence of any law or regulation therein, be discharged from such service or labor, but shall be delivered up on claim of the party to whom such service or labor may be due." This is the supreme law of the land, binding not only the respective states as such, but on the conscience and conduct of every individual citizen of the United States. It is well known that, without this clause, the assent of the Southern states could never have been obtained to this compact of union. And if, contrary to good faith, it should be practically nullified. —if individuals or state legislatures in the North can succeed in thwarting and obstructing the execution of this article of our confederation, and the rights guaranteed to the South thereby, they have no right to complain if the people of the South should treat the constitution as virtually annulled by the consent of the North, and seek secession from any alliance with open and avowed covenant breakers. Every compact must have mutuality; it must bind in all its parts and all its parties, or it binds none. Those states in the North whose legislation has made it a penal offence for their judicial and executive officers to lend their assistance in the execution of this clause of the constitution, and compels them to disregard their solemn oath to support it, have proceeded as far, and perhaps farther, in the path of nullification and secession than any Southern state has yet done. I know it is attempted to justify such legislation by casting the blame on the supreme court of the United States, and quoting certain dicta of some of the judges in the case of Prigg v. Pennsylvania [16 Pet. (41 U. S.) 539]. The question before the court in that case, and the only question which could be decided, was this, and this only: "That the master of a fugitive, having a right, under the constitution, to arrest his slave without writ, and take him away, any state legislation which interfered with or obstructed that right, and (as in the case before the court) punished the master or his agent as a kidnapper, was void." How such a decision can justify such legislation it is not easy to perceive.

[The act of congress of 1792 [1 Stat. 275], which was first made to enforce this clause of the constitution, was found to be defective and inoperative, and chiefly because it provided no legal process or public officer to make the arrest of the fugitive, and bring him before the magistrate. The forcible arrest and seizure of a man without any writ or semblance of legal authority justly became odious, because it was liable to very great abuse. There was nothing to distinguish the arrest of a master from the seizure of the vile kidnapper and man-stealer. The act of 1850 remedies this evil. It gives the master legal process and an officer of the law to make the arrest, and, moreover, gives the party arrested the benefit of a hearing and the decision of a judicial officer before he can be deported. The free colored man, who was before liable to capture by kidnappers, is better protected by this law than he was before. In this feature alone is there any characteristic difference be-

tween this act and the act of 1793 [1 Stat. 302]. to which it is a supplement. No objection had ever been urged to that act. that it was unconstitutional, because it did not give the alleged fugitive a jury trial. In no cases of extradition either of fugitives from justice or from labor, where the only question to be decided is the identity of the person whose reclamation is sought, had it ever been heard that the country or state to which he fled was to try the question of his guilt or innocence, or pass upon his rights and duties in the state from which he fled. And yet this newly-discovered argument is the only one which has ever been urged, with any pretence even to plausibility, by those who make so great clamor against this act. The truth is. the shout of disapprobation with which this act has been received by some has been caused, not because it is injurious or dangerous to the rights of freemen of color in the United States, or is unconstitutional; but because it is an act which can be executed, and the constitutional rights of the master in some measure preserved. The real objection with these persons is to the constitution itself. which is supposed to be 'void in this particular from the effect of some "higher law." whose potential influence can equally annul all human and all divine law.

[It is true that the number of persons whose consciences affect to be governed by such a law is very small. But there is a much larger number who take up opinions on trust or by contagion, and have concluded this must be a very pernicious and unjust enactment. for no other reason than because the others shout their disapprobation with such violence and vituperation. And possibly some might be found who affect to join the chorus with some slight hopes that they may be able to ride into place and power on the waves created by continual agitation. It may not be said of this law. or perhaps of any other, that it is perfect. or the best that could possibly be enacted. or that it is incapable of amendment. But this may truly be said. that while there are so many discordant opinions on the subject. it is not probable that a better compromise will be made. and most probably none of us will live to see any act on this subject made to please every one.

[Let it suffice for the present to say to you. gentlemen of the jury, that this law is constitutional; that the question of its constitutionality is to be settled by the courts. and not by conventions either of laymen or ecclesiastics; that we are as much bound to support this law as any other, and that public armed opposition to the execution of this law is as much treason as it would be against any other act of congress to be found in our statute book.

[Let us now proceed to examine more particularly the specific charge laid in this bill of indictment. the evidence given to support

them, and the questions of law involved in the case. The bill of indictment charges that the prisoner, Castner Hanway, wickedly intending and devising the peace and tranquility of the United States to disturb, and prevent the execution of the laws thereof, to wit "An act respecting fugitives from justice and persons escaping from the service of their masters," approved February 12, 1793, and another act, supplementary to the same, passed on the 16th of September. 1850, did. on the 11th of September, 1851, wickedly and traitorously intend to levy war against the United States. It then sets forth five several overt acts. (1) That with a large number of persons armed and arrayed with warlike weapons, with purpose to oppose and prevent, by means of intimidation and violence, the execution of the said laws, he did wickedly and traitorously levy war against the United States. (2) That in pursuance of said purpose, the prisoner and others. so armed and traitorously assembled to prevent the execution of said laws, did with force and arms traitorously resist one Henry H. Kline. an officer of the United States, duly appointed. from executing lawful process, and wickedly and traitorously did prevent. by force and intimidation, the execution of the said laws. (3) The third is the same with the second, with this addition, that they assaulted Kline. and liberated from his custody persons arrested by him, who owed service and labor to Edward Gorsuch, under the laws of Maryland, thereby traitorously preventing the execution of said laws. (4) That the prisoner, with the others, did traitorously meet, conspire, and consult to oppose, resist, and prevent by force the execution of said law. (5) That in pursuance of said traitorous intention, he prepared divers books, letters, resolutions, addresses, &c.. which he caused to be dispersed, containing incitements and encouragements to fugitives and others to resist, oppose, and prevent by violence and intimidation the execution of said laws.] [4]

Whether the allegations of this bill of indictment are supported by evidence, is the matter which you are sworn to try. In assisting you to arrive at a correct conclusion on these points, it is not the intention of the court to intimate an opinion on any disputed fact. But there are certain facts in the case which have not been disputed by the learned counsel, and which, in speaking of this case, we may assume to have been satisfactorily proved, as they have not been denied. They are these: That Mr. Edward Gorsuch, a citizen of Maryland. was the owner of certain slaves, or persons held to labour by the laws of that state. That these slaves had escaped and fled into Pennsylvania. and were known to be lurking in the neighbourhood of the village of Christiana. Lancaster county. That Mr. Gorsuch came to Philadelphia in

---

[4] [From 4 Am. Law J. (N. S.) 458.]

September last, and obtained warrants, for the arrest of these fugitives, from a commissioner of this court, having authority by law to issue such warrants. That these warrants were put into the hands of Kline, an officer duly authorized to execute them. That on the morning of the 11th of September, about daylight, Kline, accompanied by Gorsuch, his son, nephew, and cousin, and two other persons, citizens of Maryland, proceeded to the house of one Parker. That a person who was recognized as one of the fugitives for whom the warrants had been issued, was seen to come out of the house. That the fugitive on seeing the officer and his company, immediately fled into the house and up stairs, leaving the door open behind him. That Mr. Gorsuch pursued him, followed by the officer. That a number of negroes were collected up stairs, armed in various ways and determined to resist the capture of the fugitives. That a gun was fired by one of them at Mr. Gorsuch, and others of his assistants were struck with missiles thrown from the upper windows. That a pistol was 'then fired by the officer, not aimed at the negroes, but rather to frighten them and let them know their assailants were armed. That a parley was then held between the parties, and the negroes informed that the officer had legal process in his hands for their arrest. That the negroes demanded time for the purpose, as was supposed, of offering terms of surrender, but in reality, perhaps, to gain time for the arrival of assistance from the neighbourhood. That after some lapse of time, the defendant arrived on the ground, and at the same time, or soon after, large numbers of negroes began to collect around with various weapons of offence, such as guns, clubs, scythes, and corn-cutters. That on the arrival of these reinforcements, the persons in the house set up a yell of defiance. That the officer made known his character, and exhibited his writs to the defendant, and another white man who had arrived on the ground, and demanded their assistance in executing the warrants, which was refused. That the officer deeming the attempt to execute his writs in the face of a numerous armed and angry mob of negroes hopeless, made no further attempt to do so, being content to escape with his life. That the mob of armed negroes, now amounting to near or over one hundred persons, immediately made an attack upon the party who attended the officer. Mr. Gorsuch was then shot down, beaten with clubs, and murdered on the spot. His son, who came to his assistance, was shot and wounded, and with difficulty escaped with his life. That the nephew was surrounded and beaten, but escaped with his life; and that on the preceding evening, notice had been given in the neighbourhood, by a negro who had followed the officer from Philadelphia, that an arrest of the fugitives was intended, and that the concourse and riot of the morning, was evidently by preconcert and in consequence of such information.

Without at present further noticing the history of the transaction, or expressing any opinion of the conduct of the white people in the neighbourhood, on the occasion, we may say that the evidence has clearly shown that the participants in this transaction are guilty of riot and murder at least. Whether the crime amounts to treason or not will be presently considered.

Two questions present themselves for your inquiry: (1) Was the defendant, Hanway, a participant in the offences proved to have been committed? Did he aid, abet or assist the negroes in this transaction, without regard to the grade or description of the offence committed? (2) And secondly, if he did, was the offence treason against the United States, as alleged in this bill of indictment? The first of these questions is one wholly of fact, and for your decision alone. The last is a mixed question of law and fact. On the law, you have a right to look to the court, for a correct definition of what constitutes treason, but whether the defendant has committed an offence which comes within that category, is, of course, a matter of fact for your decision. When a murder is committed, all who are present, aiding, abetting and assailing, are equally guilty with him who gave the fatal stroke. An abettor of a murder in order to be held liable as a principal in the felony, must be present at the transaction; if he is absent, he may be an accessory. But in treason all are principals, and a man may be guilty of aiding and abetting, though not present. "If one man watch while another breaks into a house at night and robs it, both are guilty of burglary." "If A. comes and kills a man and B. runs with an intent to assist him, if there should be occasion, though in fact he doth nothing, yet he is a principal; being present as well as A." "If divers persons come with one assent to do mischief, as to kill, rob or beat, and one doth it, they are all principals in the felony." "If many be present, and one only gives the stroke, whereby the party dies, they are all principals." "Thus if two fight a duel, and one of them is killed, the seconds who are present, are both guilty of murder." "If A. and B. be fighting, and C. a man of full age comes by chance, and is a looker-on only, and assists neither, he is not guilty of murder or manslaughter, but it is a misprision for which he shall be fined, unless he uses means to apprehend the felon." Lastly, "if divers persons come in one company, to do any unlawful thing, as to kill, rob, or beat a man, or to commit a riot, or to do any other trespass, and one of them in doing thereof kill a man, this shall be adjudged murder in them all that are present of that party, abetting him, and consenting to the act, or ready to aid him, although they did but look on."

I have given you these examples from the

books, in order that you may form some idea as to the nature of what the law treats as criminal; and what it regards as aiding, abetting and countenancing the perpetration of an offence. In the present case, Hanway was confessedly present. But did he come to aid, abet, countenance or encourage the rioters? If so, he was guilty of every act committed by any individual engaged in the riot—whether it amount to felony or treason. There is no evidence of any previous connection of the prisoner with this party, before the time the offence was committed—that he had counselled, advised or exhorted the negroes to come together with arms and resist the officer of the law or murder his assistants. There is no evidence, even, that the prisoner was a member of any of these associations or conventions, which occasionally or annually infest the neighbouring village of West Chester, for the purpose of railing at and reviling the constitution and laws of the land, and denouncing those who execute them as no better than a Scroggs and a Jeffries—who stimulate and exhort poor negroes to the perpetration of offences, which they know must bring them to the penitentiary or the gallows. The fact of his interference, whether active or passive, of his aiding, counselling or abetting the perpetrators of this offence, has been argued from his language and conduct during its perpetration in his presence. His acts, his declarations and his conduct, are fair subjects for your careful examination, in order to judge of his intentions or his guilty complicity with those whose hands perpetrated the offence. If, as the counsel for the United States have argued, he countenanced or encouraged, aided or abetted the offenders in the commission of the offence, he is equally guilty with them. If, on the contrary, as is argued by his counsel, he came there without any knowledge of what was about to take place, and took no part by encouraging, countenancing, or aiding the perpetrators of the offence—if he merely stood neutral through fear of bodily harm, or because he was conscientiously scrupulous about assisting to arrest a fugitive from labour, and therefore merely refuse to interfere, while he did not aid or encourage the offenders, he may not have acted the part of a good citizen: he may be liable to punishment for such neutrality by fine and imprisonment, but he cannot be said to be liable as a principal in the riot, murder and treason, committed by the others—and much more so if, as has been argued, his only interference was to preserve the lives of the officer and his attendants. A man may have such conscientious principles on the subject of non-resistance, as to stand by with indifference and neutrality, when his father or friend is attacked by a madman, and in case of his death may not be liable as an aider or abettor in the murder or manslaughter. We may wonder at his philosophic indifference, though we cannot admire

the man. So a man who is a mere spectator in a contest where a mob of rioters are resisting an officer of the law in the execution of his duty, may refuse assistance, countenance or aid to either side. In so doing he is not acting the part of an honest, loyal citizen; he may be liable to be punished for a misdemeanor for his refusal to interfere, but such conduct will not necessarily make him liable as a principal in the riot or murder committed. But such conduct is a fair subject for the consideration of a jury, in connection with other circumstances, to show preconcert and guilty complicity with the rioters, murderers or traitors.

What inference the jury may draw from the evidence in this case of the conduct of this prisoner, is for them to say, after carefully weighing the arguments which have been so ably urged by the learned counsel.

With these remarks we submit this point of the case to the jury, after reading to them, if they desire it, the testimony of the witnesses bearing more directly on this question. If you should find that the defendant Castner Hanway did not aid, assist or abet in the perpetration of the offence, you will return a verdict of not guilty, without regard to the grade of the offence; whether riot, murder, or treason. But if you should find that he has so aided and abetted, so as thereby to become a principal in the transaction according to the rules of law which we have just stated, you will next have to inquire whether the offence as proved, amounts to the crime of "treason against the United States."

The bill charges the defendant with "wickedly and traitorously intending to levy war against the United States:" and the jury must find the act or acts to have been committed with such intention. For although the prisoner may have been guilty of riot, robbery, murder, or any other felony, he cannot be found guilty under this bill of indictment, unless you find that he intended to levy war against the United States, or that the acts were committed by himself and others in pursuance of some conspiracy or preconcert for that purpose; and this is a question of fact for the decision of the jury. But in the decision of it, the jury should regard the construction of the constitution as given them by the court as to what is the true meaning of the words "levying war." Treason against the United States, is defined by the constitution itself. Congress has no power to enlarge, restrain, construe or define the offence. Its construction is entrusted to the court alone. By this instrument it is declared that "treason against the United States shall consist only in levying war against them, or in adhering to their enemies, giving them aid and comfort. No person shall be convicted of treason, unless on the testimony of two witnesses to the same overt act, or on confession in open court." What constitutes "levying war against the

government," is a question which has been the subject of much discussion, whenever an indictment has been tried under this article of the constitution. The offence is described in very few words, and in their application to particular cases, much difference of opinion may be expected. We derive our laws as well as our language from England. As we would apply to English dictionaries and classical writers, to ascertain the proper meaning of a particular word, so when we would inquire after the true definition of certain legal phraseology we would naturally look to the text writers and judicial decisions which we know that the framers of our constitutions would regard as the standard authorities in questions of legal definition. Otherwise the language of the constitution on this subject might be subject to any construction which the passion or caprice of a court and jury might choose to give it in times of public excitement. At one time the constitution might be nullified by a narrow construction, and at another time the life and liberty of the citizen be sacrificed by a latitudinous one.

The term "levying war," says Chief Justice Marshall (Burr's Trial, vol. 2, p. 402), "is not for the first time applied to treason by the constitution of the United States. It is a technical term. It is used in a very old statute of that country whose language is our language, and whose laws form the substratum of our laws. It is scarcely conceivable that the term was not employed by the framers of our constitution, in the sense which has been affixed to it by those from whom we borrowed it. So far as the meaning of any terms, particularly terms of art, is completely ascertained, those by whom they are employed, must be considered as employing them in their ascertained meaning, unless the contrary is proved by the context." Since the adoption of the constitution but few cases of indictment for treason have occurred, and most of them not many years afterwards. Many of the English cases, then considered good law and quoted by the best text writers as authorities, have since been discredited, if not overruled, in that country. The better opinion there at present seems to be, that the term "levying war" should be confined to insurrections and rebellions for the purpose of overturning the government by force and arms. Many of the cases of constructive treason quoted by Foster, Hale, and other writers, would perhaps now be treated merely as aggravated riots or felonies. But for the purposes of the present case, it is not necessary to pursue this subject further, or to look beyond the cases decided in our own country. The subject is one of too serious importance to allow this court to indulge in speculations, or wander from the safe path of precedent.

In England, all insurrections to imprison the king, or to force him to change his measures, or to remove evil counsellors; to attack his troops in opposition to his authority; to carry off or destroy his stores, provided for defence of the realm; if done conjointly with and in aid of rebels or enemies, and not only for lucre or some private and malicious motive; to hold a fort or castle against the king or his troops, if actual force be used in order to keep possession; to join with rebels freely and voluntarily; to rise for the purpose of throwing down by force, all enclosures; alter the law or religion, &c.; to effect innovations of a public and general concern, by an armed force, or for any other purpose which usurps the government in matters of a public and general nature. All these acts have been deemed "a levying of war." So also have insurrections to redress by force national grievances; or to reform real or imaginary evils of a public nature, and in which the insurgents had no private or special interest, or by intimidation to force the repeal of a law. But when the object of an insurrection is of a local or private nature, not having a direct tendency to destroy all property and all government, by numbers and armed force, it will not amount to treason. In the case of Ex parte Bollman and Swartwout, in the supreme court of the United States (4 Cranch [8 U. S.] 75, 126–128), it is declared "that it is more safe, as well as more consonant to the principles of our constitution, that the crime of treason should not be extended by construction to doubtful cases;" "that to constitute the specific offence, war must be actually levied against the United States;" that "to conspire to levy war, and actually to levy war, are distinct offences;" and that "to complete the crime of levying war, there must be an actual assemblage of men for the purpose." This case also recognized the doctrine which had been previously laid down by Judge Chase in Fries's Case [Case No. 5,127], that "if a body of people conspire and meditate an insurrection to resist or oppose the execution of any statute of the United States, by force, they are guilty only of a high misdemeanor; but if they proceed to carry such intention into execution by force, they are guilty of the treason of levying war, and the quantum of the force employed neither lessens nor increases the crime, whether by one hundred or one thousand persons, is wholly immaterial;" and that "a combination or conspiracy to levy war against the United States is not treason, unless combined with an attempt to carry such combination or conspiracy into execution; some actual force or violence must be used in pursuance of such design to levy war; but it is altogether immaterial whether the force used is sufficient to effectuate the object; any force, connected with the intention, will constitute the crime of 'levying war.'" In Mitchell's Case [Id. 15,788] it was decided that to resist or prevent by armed force, the execution of a par-

ticular statute of the United States, is a levying war against the United States, and consequently treason, within the true meaning of the constitution. And in Fries's Case, already mentioned, "that an insurrection or rising of any body of people within the United States, to attain by force or violence any object of a great public nature, or of public, (or national) and general concern, is a levying of war against the United States." "That any such insurrection or rising to resist or prevent by force or violence the execution of any statute of the United States," "under any pretence, as that the statute was unjust, burthensome, oppressive or unconstitutional, is a levying of war against the United States within the constitution." And in a case in the circuit court of New York (U. S. v. Hoxie [Case No. 15,407]) it was declared that if the intention be, to prevent by force of arms, the execution of any act of congress altogether, any forcible opposition calculated to carry that intention into effect, is levying war against the United States. But the resistance of the execution of a law of the United States accompanied with any degree of force, if for a private purpose, is not treason. To constitute that offence, the object of the resistance must be of a public and general nature. I do not think it necessary to quote further from the decisions of my predecessors. It will suffice to say that the late charge of my Brother Kane to the grand jury, in the circuit court [Fed. Cas. Append.], contains what I believe to be a correct statement of the decisions on this subject, and that I fully concur in the doctrines stated, and the sentiments expressed in it.

In the application of these principles of construction to the case before us, the jury will observe, that the "levying of war," against the United States, is not necessarily to be judged of alone by the number or array of troops. But there must be a conspiracy to resist by force, and an actual resistance by force of arms or intimidation by numbers. The conspiracy and the insurrection connected with it must be to effect something of a public nature, to overthrow the government, or to nullify some law of the United States, and totally to hinder its execution, or compel its repeal. A band of smugglers may be said to set the laws at defiance, and to have conspired together for that purpose, and to resist by armed force, the execution of the revenue laws; they may have battles with the officers of the revenue, in which numbers may be slain on both sides, and yet they will not be guilty of treason, because it is not an insurrection of a public nature, but merely for private lucre or advantage. A whole neighbourhood of debtors may conspire together to resist the sheriff and his officers, in executing process on their property—they may perpetrate their resistance by force of

arms—may kill the officer and his assistants—and yet they will be liable only as felons. and not as traitors. Their insurrection is of a private, not of a public nature; their object is to hinder or remedy a private, not a public grievance. A number of fugitive slaves may infest a neighbourhood, and may be encouraged by the neighbours in combining to resist the capture of any of their number; they may resist with force and arms, their master or the public officer, who may come to arrest them; they may murder and rob them; they are guilty of felony and liable to punishment, but not as traitors. Their insurrection is for a private object, and connected with no public purpose. It is true that constructively they may be said to resist the execution of the fugitive slave law, but in no other sense than the smugglers resist the revenue laws, and the anti-renters the execution laws. Their insurrection, their violence, however great their numbers may be, so long as it is merely to attain some personal or private end of their own, cannot be called levying war. Alexander the Great may be classed with robbers by moralists, but still the political distinction will remain between war and robbery. One is public and national, the other private and personal.

Without desiring to invade the prerogatives of the jury in judging the facts of this case. the court feel bound to say, that they do not think the transaction with which the prisoner is charged with being connected, rises to the dignity of treason or a levying of war. Not because the numbers of force was insufficient. But (1) for want of any proof of previous conspiracy to make a general and public resistance to any law of the United States; (2) because there is no evidence that any person concerned in the transaction knew there were such acts of congress, as those with which they are charged with conspiring to resist by force and arms. or had any other intention than to protect one another from what they termed "kidnappers" (by which slang term they probably included not only actual kidnappers, but all masters and owners seeking to recapture their slaves, and the officers and agents assisting therein).

The testimony of the prosecution shows that notice had been given that certain fugitives were pursued; the riot. insurrection, tumult. or whatever you may call it. was but a sudden "conclamatio" or running together, to prevent the capture of certain of their friends or companions, or to rescue them if arrested. Previous to this transaction, so far as we are informed, no attempt had been made to arrest fugitives in the neighbourhood under the new act of congress by a public officer. Heretofore arrests had been made not by the owner in person, or his agent properly authorized, or by an officer of the law. Individuals without any authority. but incited by cupidity, and the hope of obtaining the reward offered for the return of a fugitive, had

heretofore undertaken to seize them by force and violence, to invade the sanctity of private dwellings at night, and insult the feelings and prejudices of the people. It is not to be wondered at that a people subject to such inroads, should consider odious the perpetrators of such deeds and denominate them kidnappers—and that the subject of this treatment should have been encouraged in resisting such aggressions, where the rightful claimant could not be distinguished from the odious kidnapper, or the fact be ascertained whether the person seized, deported or stolen in this manner, was a free man or a slave. But the existence of such feelings is no evidence of a determination or conspiracy by the people to publicly resist any legislation of congress, or levy war against the United States. That in consequence of such excitement, such an outrage should have been committed, is deeply to be deplored. That the persons engaged in it are guilty of aggravated riot and murder cannot be denied. But riot and murder are offences against the state government. It would be dangerous precedent for the court and jury in this case to extend the crime of treason by construction to doubtful cases, and our decision would probably operate in the end to defeat the purposes of the law, which the government seeks to enforce.

I cannot conclude this charge to the jury, without availing myself of the occasion which it offers, to express the satisfaction which the court has in seeing here the attorney general of the state of Maryland and the private counsel associated with him; for although the ordinary officers of the United States are deserving of all praise for the vigilance, ability and learning they have shown in bringing offenders to justice, the indignation felt by the people of Maryland at the calamitous and disgraceful murder of Mr. Gorsuch, are most natural indeed; and we receive their representatives here, in defence of the law, with cordial respect and readiness, in the hope that it may efface all angry feeling between the people of these two states, and foster those of respect and friendship.

5 [The time may come when, with an elective judiciary, dependent on the will of the majority (which is here the sovereign power), may use such a precedent to justify the foulest oppression and injustice, and the tragedies enacted by a Scroggs and a Jeffries be repeated, and again sully the page of history. But I would not be doing justice to all parties concerned in this prosecution, if I did not express my cordial approbation of the course pursued by the authorities of the United States and state of Maryland on this occasion. This is the second instance in which a citizen of Maryland, in the legitimate pursuit of rights, guaranteed to him by the constitution, has been foully murdered on the soil of Pennsylvania. As might be expected, it created a great excitement, and a just feeling of indignation in the breasts of the people of Maryland.

[The act of 1850, passed to secure them in the enjoyment of their acknowledged rights, had been received with a shout of disapprobation, in certain parts of the country. Meetings had been held in many places in the North, denouncing the law, and advising a traitorous resistance to its execution; conventions of infuriated fanatics had incited to acts of rebellion, and even the pulpit had been defiled with furious denunciations of the law, and exhortations to a rebellious resistance to it. The government was perfectly justified in supposing that this transaction was but the first overt act of a treasonable conspiracy extending over many of the Northern states to resist by force of arms the execution of this article of the constitution and the laws framed in pursuance of it. In making these arrests, and having this investigation, the officers of government have done no more than their strict duty. The activity, zeal, and ability which have been exhibited by the learned attorney of the United States in endeavoring to bring to condign punishment the perpetrators of this gross offence, are deserving of all praise. It has given great satisfaction to the court also that the learned attorney general of Maryland, and the very able counsel associated with him, have taken part in this prosecution. And I am persuaded that, notwithstanding the unfortunate and disgraceful occurrence which has taken place, and the just feelings of indignation felt by the people of Maryland, caused by it, that this meeting of that state by its representative here with the people of Pennsylvania will tend to efface all angry feelings, and foster those of respect and friendship between the people of these adjoining states. And though the duty of punishing the perpetrators of this outrage may have to be transferred, in whole or in part, to the courts of Lancaster county, we have an assurance, from the activity and zeal already exhibited by the law officers of that county, that it will be performed with all fidelity. With these remarks the case is committed to you.

[The jury found for the defendant.] 6

7 [Mr. J. W. Ashmead said that the prisoner was also charged on four other bills for misdemeanor; but as he had passed through such an ordeal, he purposed entering a nolle prosequi on those bills. If the state does not hold him for anything else, I move for his discharge

[GRIER, Circuit Justice, said, that, on motion, the prisoner was discharged.] 7

---

5 [From 4 Am. Law J. (N. S.) 458.]
26 FED. CAS.—9

6 [From 4 Am. Law J. (N. S.) 458.]
7 [From Clerk's Book (Philadelphia) p. 169.]